<div align="right">June 1821.

Hammond
vs
Ridgely</div>

DECREE REVERSED.

---

## COURT OF APPEALS, JUNE TERM, 1821.

### Hammond vs. Ridgely's Lessee.

Appeal from a judgment rendered in *Anne-Arundel* county court in an action of ejectment brought to recover two tracts of land, one called *Dorsey's Search*, (the original survey,) and *Dorsey's Search*, (the resurvey thereon,) lying in *Anne-Arundel* county. The defendant in the court below, (now appellant,) took defence for a tract of

<div style="float:right">Whatever question was binding on the late court of appeals, is equally binding on the present court of appeals Whether the 66th article of the constitution, which provides "that there shall be a court of appeals</div>

composed of persons of integrity," &c. "whose judgment shall be final and conclusive in all cases of appeals," &c. means simply that the court of appeals should be a tribunal of ultimate resort? *Quere*. Whether the verdict and judgment in one action of ejectment is a bar to a recovery in another? *Quere*

Whether the expressions in the act of 1790, *ch* 42, "that the opinion of the court of appeals shall be conclusive in law as to the question by them decided," means only, that the opinion of the court of appeals shall be conclusive upon the inferior court on the new trial of the particular suit sent back to them by a *procedendo*, and can have no reference to any subsequent suit? *Quere*

If an action of ejectment is entered for the use of any person, such person is substantially a party to the action

The construction of a grant of land falls peculiarly within the province of the court, and is not a matter fit to be left to a jury, except only in a case of latent ambiguity

Where a grant of a tract of land is described as "lying on the W side of the N branch of *Patuxent* river, beginning at a bounded red oak, standing by the said river, and running (three courses) to a bounded white oak standing by the said river, then bounding on the said river running S 6 degs E 270 perches, then by straight line to the first bounded tree"—Held, that the fifth or last line thereof must and could only be located by running a straight course from the end of the fourth line, wherever that may be, to the beginning, and the meanders of the river *Patuxent* could not be pursued without a direct violation of the grant

So also, where a grant of a tract of land is described as "beginning at three bounded white oaks standing by *Patuxent* river, and running and bounding on the said river N 4 degs. E 87 perches, then N (sundry courses) then N 1 deg. W 40 perches to a bound white oak by the river, then S 47 degs. E 388 perches, to a bound white oak, then by a straight line to the first bounded white oaks"—Held, that the first course is to be run N 4 degs. E 87 perche, bounding the same on the river *Patuxent*, and all the subsequent courses are to be run according to the course and distance, until the course N 1 deg. W 48 perches

So also where a tract of land is described in a grant as "lying in the fork of *Patuxent* river, beginning at a bounded white oak standing near the head of a branch, running from the said branch S W by W 180 perches to a bounded red oak standing on the E side of the W great branch of the said river, then bounding on the said great branch, running W N W 40 perches, then W S W 28 perches, then" (sundry courses) "then N and by E 10 perches to a bounded beech standing by the said branch, then into the woods N E by N 220 perches to a bound'd red oak," &c—Held, that the true construction of the grant is to bind on the *Patuxent* river from the second boundary, (admitted to be standing by the the east side of the western great branch of the said river,) the several courses mentioned in the grant, to the bounded beech standing by the said great branch; and that if there was no satisfactory proof of the beech, or the place where it stood, then the course N by E 10 ps. must terminate by the great branch. *(Note )*

A deputy surveyor has no authority to survey lands lying in another county, and on the return of his certificate of such survey, a grant, on a caveat, would be refused. But if a grant was obtained, and no fraud practised in the obtention of it, it will operate to pass the land

Where there are conflicting grants and interfering locations of the lands of A and B, and the part of the land claimed by A is within the lines of the grant to B, and A, and those under whom he claimed, had been in possession, and used and occupied the part so claimed by him for upwards of 100 years, the court will not direct the jury to presume a deed from the grantee, under whom B claimed, to the grantee under whom A claimed, for the part thus claimed, or that there had been an actual ouster of such part. But if A. and those under whom he claimed, were in the adversary, uninterrupted, and exclusive possession, by enclosure, of the land in dispute, for 20 years, that in such case B will be barred by the act of limitations

A devise of a tract of land by name, and described as lying in *Baltimore* county, passed the whole tract, though part of it lay in another county

If the grantor in a deed is in possession of part of the tract of land conveyed, that possession will extend to the whole tract, unless there had been an adversary, uninterrupted, and exclusive possession, by enclosures, of a part of the land, by some other person, for 20 years prior to the execution of such deed

JUNE 1821.

Hammond
vs
Ridgely

land called *Dryer's Inheritance*, as located upon the plots made in the cause.

1. At the trial, the plaintiff, (now appellee,) read in evidence a certificate and grant of the tract of land called *Dorsey's Search*, surveyed by the surveyor of *Anne-Arundel* county, for *John Dorsey*, on the 6th of December 1694, and granted to him on the 26th of March 1696, stating the said tract as "lying at *Elk Ridge*, beginning at three bounded white oaks standing by *Patuxent* river, and *running and bounding on the said river* N 4° E 87 perches, then N 62° E 50 perches, then," &c. [*sundry courses*,] "then N 1° W 48 perches *to a bound white oak by the river*, then S 47° E 388 perches to a bound white oak, then *by a straight line to the first bounded white oaks*, containing, and now laid out for 479 acres of land," &c. He also offered evidence, that *John Dorsey*, the grantee, entered upon the said land in virtue of the said grant, had a plantation thereon, and died in the year 1714, having by his will, dated the 26th of November 1714, among other things, devised as follows, viz. "I give and bequeath unto my grandson, *John Dorsey*, son of my son *Edward Dorsey*, deceased, my *Patuxent plantation*, and the land thereunto adjoining, called *Dorsey's Search*, lying in *Baltimore* county, to hold to him during his natural life; and from and after his decease, then I give, devise, and bequeath my aforesaid land and plantation, given him as aforesaid, unto the heirs of the body of my said grandson *John Dorsey*, to be begotten, forever; and for want of such heirs, then," &c. He then offered evidence that the last named *John Dorsey* entered on the said land, and on the 27th of March 1723, resurveyed the same by the surveyor of *Baltimore* county, and obtained a certificate thereon, also called *Dorsey's Search*, on which he obtained a grant dated the 10th of June 1734, "for all that tract or parcel of land called *Dorsey's Search*, with its vacancy added, lying and being formerly in *Baltimore*, but now in *Anne-Arundel* county aforesaid, on *Elk Ridge*, and on the east side of *Patuxent* river, beginning at three bounded white oaks, (being the third boundary of the land called *Long Reach*,) standing near the aforesaid river side, said trees being the original beginning trees of the said *Dorsey's Search*, and running thence up and with the said river, N 4° E 124 perches, thence," &c. [*sundry*

courses,] "to a parcel of land called *Dryer's Inheritance*, thence with said land N 9° E 185 perches, thence," &c. [*two courses*,] "to an original bounded white oak of *Dorsey's Search*, thence S 47° E 432 perches, to the land called *Long Reach*, thence with the said land to the aforesaid three bounded white oaks, containing and now laid out for 750 acres of land more or less." He also offered evidence to prove, that *John Dorsey*, the devisee, entered upon *Dorsey's Search*, (the resurvey,) and died seized thereof, and of *Dorsey's Search*, (the original,) in the year 1761, having by his will, dated the 15th of June 1761, devised unto his son *Benjamin Dorsey*, and his heirs, "all the land taken by warrant of resurvey adjoining to *Dorsey's Search*." The plaintiff then, to prove that the said tracts of land, both the original and resurvey, did run and lie both on the east and west side of *Patuxent* river, offered in evidence the original certificate of the resurvey on *Dorsey's Search*, made for the party as aforesaid. He then offered evidence that *Dorsey's Search*, the original, descended, on the death of *John Dorsey*, the devisee aforesaid, to *Ely Dorsey* his heir in tail, who entered thereon and was possessed thereof, and that he and *John C. Dorsey*, his eldest son, on the 26th of September 1777, conveyed *Dorsey's Search*, the original, to *Joseph Howard*; and that *Howard* afterwards, on the succeeding day, reconveyed the same land to *Ely Dorsey*; and that *Ely Dorsey* died in the year 1794, having by his will dated the 22d of October 1789, devised to his executrix, *(Deborah Dorsey,)* for the purpose of selling the same, the tract of land called *Dorsey's Search*, the same to be sold at public vendue to the highest bidder, after notice, &c. and the money arising from the sale to be equally divided between the children of his two daughters, &c. That *Deborah Dorsey* entered upon the said lands, and by virtue and in pursuance of the powers given to her by the said will, sold and conveyed the said lands to *Richard Ridgely*, by deed bearing date the 15th of March 1796. That *Richard Ridgely* entered upon the said land, and by his deed dated the 16th of March 1796, conveyed the same to *Daniel Dorsey* by way of mortgage. The plaintiff then offered evidence, that *Benjamin Dorsey* above named, in virtue of the will of his father, entered into the land called *Dorsey's Search*, the resurvey, and on the 13th of September 1774, conveyed the same to *Elea-*

June 1821. nor *Dorsey*, wife of *Samuel Dorsey*, and that she and her husband entered thereon; that the said *Eleanor* survived her husband, and after his death conveyed the said last mentioned land to *Harry Woodward Dorsey*, by her deed bearing date the 28th of November 1794; and that *Harry Woodward Dorsey* entered thereon, and conveyed the same to *Richard Ridgely*, by deed dated the 16th of April 1798. That *Richard Ridgely* entered thereon, and conveyed the same to *Daniel Dorsey*, by his deed of mortgage dated the 18th of April 1798. The plaintiff, to prove that *John Dorsey*, the grantee of *Dorsey's Search*, the original, and all those claiming under him, always claimed, possessed and used the said land, according to the true location, on both sides the river *Patuxent*, read in evidence, by consent, the depositions of the said *Benjamin Dorsey*, and *Ely Davis*. The plaintiff then gave in evidence two deeds from *Daniel Dorsey* to *Richard Ridgely*, the lessor of the plaintiff, one dated the 8th of April 1814, and the other dated the 15th of August 1818, being releases of the deeds of mortgages herein before mentioned. And that *Richard Ridgely*, the lessor of the plaintiff, is the same *Richard Ridgely* who conveyed *Dorsey's Search*, the original, and *Dorsey's Search*, the resurvey, to *Daniel Dorsey*, by deeds of mortgage herein before mentioned; and that the said *Ridgely*, from the time of the execution of the deeds before mentioned from him to *Daniel Dorsey*, has always remained in the possession of both of the said tracts of land. And he offered evidence that the plots, certificates and explanations, in this cause, as there made by the plaintiff, are correctly and truly located. He also read in evidence a certificate of *The Addition*, surveyed for *Thomas Brown* on the 16th of September 1707; also a certificate of *The Triangle*, surveyed for *Charles Hammond* the 20th of June 1761; and also a certificate of *The Attempt*, surveyed for *William Hammond* the 3d of March 1796. The defendant then read in evidence a certificate and grant of the tract of land called *Dryer's Inheritance*, surveyed for *Samuel Dryer* on the 25th of February 1695, and granted to him on the 10th of March 1695, stating that tract as "*lying on the west side of the north branch of Patuxent river*, beginning at a bounded red oak standing *by the said branch*, it being a bounded tree of *Thomas Brown's*, and running N 62° W 86 perches to a

Hammond
vs
Ridgely

bound red oak in a branch, then N 6° W 362 perches to
a bound white oak, then N 66° E 120 perches *to a bound*
*white oak standing by the said river*, then *bounding on*
*the said river, running S 5° E 270 perches*, then *by a straight*
*line to the first bounded tree*, containing and now laid out
for 254 acres of land," &c.  The defendant then read in
evidence certificates and grants of the following tracts of
land, viz. *Brown's Forest*, surveyed for *Thomas Brown*
the 24th of February 1695; *Freeborn's Progress*, surveyed
for *Thomas Freeborn*, the 25th of October 1695; *Dor-*
*sey's Search*, the original, and *Dorsey's Search*, the resur-
vey, before mentioned; and also *Hammond's Inheritance*,
surveyed for *Rezin Hammond* the 1st of March 1796.
And the defendant offered in evidence the plots and expla-
nations in this cause, and that the locations of those re-
spective tracts of land, as there made by her, are truly and
correctly made.  She then offered in evidence, that *Samu-*
*el Dryer* entered upon *Dryer's Inheritance* under his grant,
and possessed himself thereof; and entered into a contract
with *Amos Garreit* to convey to him the said land, by
bond dated the 4th of September 1708.  And also a deed
from *Dryer*, and his wife, to *Garrett*, dated the 8th of
September 1708, conveying to him the said land.  She al-
so offered in evidence a deed for the said land called *Dry-*
*er's Inheritance*, from *William Woodward, Mary Holmes*,
and *Elizabeth Ginn*, to *Philip Hammond*, dated the 30th
of September 1736, which deed recites, among other things,
that *Amos Garrett* died intestate, whereby all his real es-
tate descended to and vested in *Mary Woodward* and *Eli-*
*zabeth Ginn*, his two surviving sisters, as parceners or
tenants in common; that *Mary* is since also dead, having
by her will devised unto *William Woodward* and *Mary*
*Holmes*, their heirs and assigns, all her undivided moiety
of the said real estate, &c.  And that the said deed was
duly executed by the said grantees to the said *Hammond;*
and that the recitals in the said deed were true.  The de-
fendant then offered in evidence, that *Philip Hammond*,
by virtue of the said deed, entered into *Dryer's Inheri-*
*tance*; and by his will, dated the 6th of June 1754, he de-
vised the said tract of land, amongst others, to his six sons
*Charles, John, Philip, Denton, Rezin* and *Matthias*, and
their heirs, as tenants in common; and that on the 20th of
May 1760, the devisees in the said will having entered up-

JUNE 1821

Hammond
vs
Ridgely

June 1821. on and become seized of the lands devised to them by the said will, as tenants in common, the said *Charles, John, Philip, Denton* and *Matthias,* conveyed all their right, &c. in the said land, to the said *Rezin Hammond,* by several deeds, that by *Charles* bearing date the 28th of July 1773; that by *John* on the 24th of March 1772; that by *Philip* and *Denton* on the 18th of January 1774, and that by *Matthias* on the 21st of April 1777. And gave in evidence that the defendant is entitled to *Dryer's Inheritance* and *Hammond's Inheritance,* under the said *Rezin Hammond,* who is dead.

Hammond
vs
Ridgely

The plaintiff and defendant both offered in evidence sundry other matters and things, but as they were not taken into consideration by the court in deciding the questions which arose in the case, they are omitted. The defendant also offered in evidence the record of proceedings in an action of ejectment brought in the late general court by *Daniel Dorsey's* lessee, against *Rezin Hammond,* and the judgment therein. [The evidence offered in that action was similar to that offered in this action, but much of which is omitted here, and also in the report of that case in 1 *Harris and Johnson's Reports,* 190, in which said action the jury found a verdict for the plaintiff, and a judgment was rendered for him at October term 1801; and from which judgment the defendant therein, appealed to the court of appeals.] The defendant also offered in evidence the record of the proceedings and judgment of the court of appeals, on an appeal in that court prosecuted by the said *Rezin Hammond* against the said *Daniel Dorsey's* lessee, and the opinion of the court of appeals thereon, reversing the judgment of the general court, which had been rendered for the plaintiff in that court, and awarding a *procedendo.* [See 1 *Harris and Johnson,* 201.] The defendant also gave in evidence, that notwithstanding the deeds from *Richard Ridgely* to *Daniel Dorsey,* herein before mentioned, the said *Ridgely* remained in possession of the lands mentioned in the said deeds; and that the said action of ejectment, instituted in the general court in the name of *Daniel Dorsey's* lessee against *Rezin Hammond,* was instituted by the said *Ridgely,* and for his use, by his directions; that it was on the part of the plaintiff, conducted by him, and under his directions; that the lawyers, who appeared on behalf of the plaintiff, were employed by him, and the expenses of the said

suit in the different courts were paid by him. The defendant further offered in evidence the record of proceedings in the said action of ejectment, by *Daniel Dorsey's* Lessee against *Rezin Hammond,* after the judgment of the court of appeals, under the *procedendo* in that cause, wherein, on a new trial thereof, the jury gave their verdict for the defendant therein, and a judgment was rendered thereon at October term 1804. [See 1 *Harris and Johnson,* 202.] The defendant further offered in evidence, that the grantees, devisees, and alienees of *Dorsey's Search,* the original, and *Dorsey's Search,* the resurvey, only actually entered respectively by virtue of the respective grants, wills and deeds, upon the said land, situate on the east side of the river *Patuxent,* and that all the land on the west side of *Patuxent,* contained within the limits of *Dryer's Inheritance,* according to the first location thereof made by the defendant, was, long before the resurvey of *Dorsey's Search,* entered upon by *Samuel Dryer,* and held and possessed, used, and occupied by him, and that the same hath ever since been held, possessed, used and occupied, exclusively by the said *Dryer,* and those holding under him, claiming the same as their property and right; and that the locations made on the plots by the defendant, where they differ from the locations of the plaintiff, are correct. The plaintiff then prayed the opinion of the court, and their direction to the jury, that the true construction of the grant of *Dryer's Inheritance* is to run the fourth line thereof binding on *Patuxent* river, from the boundary admitted by the parties marked on the plots at the figures 14 and 15, and from the point on the river where the jury shall find the said fourth line to terminate, to run a straight line to the first bounded tree of *Dryer's Inheritance* marked on the plots at the figures 53. The defendant thereupon objected, that the court could not, consistently with their duty, give the opinion prayed for, because the court of appeals had heretofore given an opinion upon the same question arising on the same location of the said certificate and grant of *Dryer's Inheritance,* and on solemn argument had adjudged, that the expressions of the said certificate and grant are doubtful and uncertain, and that it is the province of the jury to determine upon such evidence as might be offered to them, whether the said tract shall bind

JUNE 1821.

Hammond
vs
Ridgely

on the last line with the river or not; which opinion and judgment of the court of appeals remains in full force, and has never been reversed or overruled, and consequently, the defendant contends, is binding on this court, as an inferior tribunal in all cases where this question can occur, but particularly in the present case, which is between the defendant, who claims under *Rezin Hammond*, the defendant in that cause, and *Richard Ridgely*, for whose use that suit was not only stated on the record to be brought, but was actually instituted and prosecuted. And the defendant gave in evidence to the court, that although deeds had been executed by *Ridgely* to *Dorsey*, as in the said record, yet that *Ridgely* remained in possession of the lands mentioned in the said deeds, and that the said suit was commenced and conducted by his directions; that he employed and paid counsel for the plaintiff; entered into agreements with the defendant, as the person actually interested, and the real plaintiff, although *Daniel Dorsey's* lessee was the nominal plaintiff, and that he paid not only the defendant's costs of the said action, as being answerable to the defendant for them, but also the fees which accrued against the plaintiff therein. Wherefore the defendant prayed the opinion of the court, whether they were not concluded by the judgment of the court of appeals from giving the directions as prayed. The defendant also objected to the court's giving the opinion as prayed by the plaintiff, because the same was not warranted by the grant of *Dryer's Inheritance*, which was in truth doubtful and uncertain, as to whether that tract should be bounded on the last line by the river, which must be decided by the jury on evidence to be offered to them; and the defendant offered to prove, that it was the intention of the parties that the said tract should so bind by the river; and for that purpose, to prove, that in a great number of surveys made by *Richard Beard*, the surveyor who made the survey of *Dryer's Inheritance*, he has used similar expressions, where it is notorious they were intended to bind all their river courses by the water, and where they have been admitted, or decided judicially, that they ought so to be located. That *Dryer* entered upon the said survey, claimed it as binding with the river, built his house at figures 103 on the plots, more than 100 years past; made his improvements between the home line and the river; used and occupied all the land between the fourth and fifth lines, and the river, claimed as his property and

right; and that he, and those claiming under him, have ever <span>June 1821.</span>
since so used, occupied, held, possessed and claimed. That
the original grantee of *Dorsey's Search*, the original, never
entered upon, held, occupied or claimed, any part of the
land on the west side of the river, but acknowledged, that
that survey did not include any land on the west side of
the said river; that the grantee of *Dorsey's Search*, the re-
survey, neither held nor claimed any land on the west side
of the said river; and that no person claiming under the
said grantees, or either of them, ever held or possessed
any land on the west side of the said river, or pretended
to claim any land on the west side until more than thirty
years after the said resurvey was made. The defendant
then referred to the record and decision made by this court
in the suit of *Charles Duvall* against *Nathan Jones*, and
the plots and explanations in that cause, and the certificate
and grant of *Robin Hood's Forest*, there located(*a*).

Hammond
vs
Ridgely

(*a*) The case here referred to, was an action of trespass *quare clau-sum fregit*, being a tract of land called *Robin Hood's Retreat*. The defendant took defence upon plots made in the cause for a tract of land called *Robin Hood's Forest*, as covering the land on which the trespass was alleged to have been committed. At the trial of the cause at April term 1818, the defendant read in evidence the grant of *Robin Hood's Forest*, in which that tract is stated as "lying in the fork of *Patuxent* river, beginning at a bounded white oak standing near the head of a branch, running from the said branch S W by W 180 perches, to a bounded red oak standing on the east side of the west great branch of the said river, then bounding on the said great branch running W N W 40 perches, then W S W 28 perches, then," &c &c. "then N and by E 16 perches to a bounded beech standing by the said great branch, then into the woods N E by N 220 perches to a bounded red oak," &c. And prayed the opinion of the court, and their direction to the jury, that in locating the second line of *Robin Hood's Forest*, they must run the same from the boundary, (admitted by both parties,) marked on the plots at the letter E, binding on the said branch of *Patuxent* river, and then from the end thereof, run the thirty-two following lines, course and distance, independently of and without regarding the preceding call in the grant of binding and running with the said branch of *Patuxent* river.

CHASE, Ch. J. (*a*). The court are of opinion, that the true construction of the grant of *Robin Hood's Forest*, is to bind on the *Patuxent* river from the letter E on the plots, (admitted to be the second boundary standing by the east side of the western great branch of the said river,) the several courses mentioned in the grant, to the bounded beech standing by the said great branch. The expression to a bounded beech standing by the said great branch, coupled with the next expression, "then into the woods N E and by N 220 perches, to a bounded red oak," and both combined with the words in the first course, "then bounding on the said great branch running W N W 40 perches," and it appearing also by the grant, that when the surveyor left the river, he calls for a tree at the end of every course, indicate plainly the intention to have been to run all the subsequent

A grant of land described as "lying in the fork of *Patuxent* river, beginning at a bounded white oak standing near the head of a branch, running from the said branch S W by W 180 perches to a bounded red oak standing on the E side of the W great branch of the said river, then bounding on the said great branch, running W N W 40 perches, then W S W 28 perches, then W 16 perches and by E 16 perches, and by E 16 perches to a bounded beech standing by the said great branch, then into the woods N E by N 220 perches, then W perches, then W 28 perches, then N and by E 16 perches to a bounded beech standing by the said great branch, then into the woods N E by N 220 perches to a bounded oak," &c must be located to bind on *Patuxent* river from the second boundary, standing by the E side of the western great branch of the river, the several courses mentioned in the grant, to the bounded beech standing by the said branch.

June 1821.

Hammond
vs
Ridgely

CHASE, Ch. J.  The court are of opinion, that between the same parties and those claiming under them, the judgment of the court of appeals on the same question of law is conclusive.  But *Richard Ridgely*, the lessor of the plaintiff in the present suit, was not a party in the former suit of *Daniel Dorsey's* lessee against *Rezin Hammond.* It having been entered on the docket for the use of *Richard Ridgely*, does not make him the party.  The legal estate vested in *Daniel Dorsey*, the mortgagee, under the mortgage from *Richard Ridgely*, on payment of the mortgage money, and executing the release from *Daniel Dorsey* to *Richard Ridgely*, he was in of his former estate by a title paramount to that of *Daniel Dorsey*.  *Richard Ridgely* had only an equity of redemption until the mortgage money was paid.  No acts of the mortgagee could affect his equitable right, or diminish his interest.  A *cestui que trust* cannot bring an ejectment.  The entry on the docket, that it was for *Richard Ridgely's* use, cannot make him the party, or conclude him on the question of law decided in the case of *Daniel Dorsey's* lessee against *Rezin Hammond;* and his having had the conduct of the suit, because he had the equity of redemption in the land, could not make him the party in contemplation of law, or conclude him by the decision of the court of appeals in the case referred to.

It is the province of the court to decide on the construction of grants, except in the single instance of a latent ambiguity.

It is the unquestionable right and province of the court to decide on the construction of grants, as well as to the thing granted, as to the nature and quality of the estate which passes by it, except in the single instance of a latent ambiguity.

The construction of a grant is to be made according to the intention of the parties to be collected from the words and expressions contained therein.

The construction of the grant is to be made according to the intention of the parties, to be collected from the words and expressions contained in the grant, if such intention is not inconsistent with some rule or principle of law.

courses on the great branch to the beech.  If there is not satisfactory proof of the beech, or the place where it stood, then the course N and by E 16 perches must terminate by the great branch.

*Magruder* and *Stephen*, for the plaintiff.

*T. B. Dorsey* and *Bowie*, for the defendant.

In doubtful cases, that exposition is to be given which is most beneficial for the grantee; and pursuant to that principle, the preference was given to calls originally, because generally, the location by calls gave the grantee more land than the location according to course and distance. Almost every grant that has calls, as well as courses and distances, is susceptible of a double location, because the call, and the course and distance, seldom, if ever, precisely agree.

If the call is imperative or peremptory; in the judgment of the court, it must be complied with, and the course and distance rejected, if they do not correspond with the call.

If the call is not imperative, or cannot be proved, the location must be according to course and distance.

In all ejectments, in which the controversy is about the location of the land, the land must be located according to the different views or pretensions of the contending parties, and to support these locations, the evidence is introduced on which the questions of law arise as to the true location of the land, which must conform to the true exposition of the grant.

A latent ambiguity, is an ambiguity concealed, or not apparent on the face or inspection of the grant, but is created by the introduction of parol evidence, showing that the grantor, for instance, had two tracts of land called *Black Acre*, the name of the land granted; parol evidence is admissible to show, for the purpose of explaining and removing the ambiguity, which tract of land was intended to pass, and the finding of the jury will give effect and operation to the grant, by ascertaining which tract passed. In this way the right of expounding the grant, and locating the land according to such exposition, devolves on the jury, and is rightfully vested in them.

So in the case of a call for the head of a creek called *Swan Creek*, and there are two creeks of that name; and so if there are two places set up as the head of *Swan Creek*— the jury are to determine in the first case according to the evidence, which creek was intended; and in the second, which place is the head of the creek.

So if a tree is called for, and there are two trees set up as the call; and so if the line of a tract of land is called for, and there are two tracts of that name—the jury are

June 1821.

Hammond vs Ridgely

In doubtful cases that exposition is to be given which is most beneficial to the grantee

Calls in grants, if imperative, must be complied with, and the course and distance rejected, if they do not correspond with the call. If the call is not imperative, or cannot be proved, then the location of the land must be according to the course and distance. When the controversy is, as to the location of the land, it must be located on the plots, by the parties, and to support such locations, the evidence produced must conform to the true exposition of the grant

Parol evidence is introduced where there is a latent ambiguity, not apparent on the face of the grant, as where the grantor had two tracts of land called B, or if a tree is called for, and there are two trees set up as the call, &c

JUNE 1821.

Hammond
vs
Ridgely

to decide which is the tree intended, and which is the tract of land intended, and at what part of the line the intersection was. All these are instances of a latent ambiguity, and of locations with a double aspect. Many other instances could be enumerated, but these will suffice to show the ideas of the court of a latent ambiguity.

These principles and positions being laid down, which the court consider as incontrovertible, will guide the court to a right decision of the question now submitted to them by the prayer made by the counsel for the plaintiff, for their direction to the jury, as to the true construction of the grant of the land called *Dryer's Inheritance.*

A tract of land described in a grant as running sundry courses to bounded trees, "then N 66 deg. E 120 prs to a bounded white oak standing by the river, then bounding on the said river running S 5 deg. E 270 prs. then by a straight line to the first bounded tree" The last course was held to run a straight line, and not to bind with the river to the beginning

What is the plain intent and meaning of the parties, to be collected from the words of the grant, "beginning at a bounded red oak standing by the said branch of *Patuxent* river, and running N 62° W 86 ps. to a bounded red oak in a branch, then N 6° W 362 ps. to a bounded white oak, then N 66° E 120 ps. to a bounded white oak standing by said river, then bounding on the said river, running S 5° E 270 ps. then by a straight line to the first bounded tree?" The beginning, the first, second, third and fourth courses, are all admitted as exhibited and delineated on the plots, and the *Patuxent* river, as located, the place where the fourth line terminates on the river, to be found by the jury, expending the number of perches on the meanders of the said river. The only contest is about the running of the fifth and last course, which closes the survey, "then by a straight line to the first bounded tree." This expression appears to be plain and free from doubt, and every person of good understanding, unaccustomed to the subtle and refined reasonings of ingenious men of the profession, would say, without hesitation, that the intention was to run directly by a straight line from the termination of the fourth line at the river, to the beginning, and not circuitously with the windings of the river. Why? Because a straight line is not a crooked one, and a line from one given point to another must be a straight one; and because the fifth course is a distinct sentence, and because there is no expression in it that has a call for the river, or any reference to it; and because the intention is to be collected from the words of the grant, and nothing extrinsic or *de hors* the grant, can be resorted to in the construction of it, and because it is an imperative call from the end of the fourth line, run-

ning the said fourth line 270 perches with the meanders of the river, and from thence to the first bounded tree, admitted to be the beginning, by a straight line, and because, if the surveyor had intended to bind on the river, he would have said, then with the river to the beginning.

The court are of opinion, that the fifth course, "then by a straight line to the first bounded tree," admitted to be the beginning, excludes all doubt, is an imperative call, and must be gratified, and must run from the termination of the fourth line, (the place to be ascertained by the jury,) by a straight line to the beginning, and not with the windings and meanders of the river, but binding on the said straight line. The defendant excepted.

2. The *plaintiff* then prayed the opinion of the court, and their direction to the jury, that according to the true construction of the grant of *Dorsey's Search*, (the original,) the first line thereof is to be located binding on the *Patuxent* river, and all the subsequent courses are to be run according to their course and distance, until you come to the N 1° W 48 perches course. But the defendant objected to the court's giving the direction as prayed for; and prayed the opinion of the court, and their direction to the jury, that according to the true grammatical construction and evident meaning of the expressions used in the grant of *Dorsey's Search*, the original, that tract, from its beginning at figures 90, to its second boundary at figures 91, ought to bind on the said river, and not extend over the river to the westward thereof, so as to include any land on the west side thereof; and that the expressions, "and bounding on the said river," were not in construction to be confined to the first course, but related to the whole of the courses mentioned, which are stated to be run from the beginning to the second tree by the river side. And further prayed the opinion of the court, and their direction to the jury, that it appearing from the evidence that the plaintiff and defendant agree as to the location of the river *Patuxent*, and of the beginning of *Dorsey's Search*, the original, at the figures 90, also of the next boundary called for in the grant at the figures 91, and only differ as to the manner in which the said tract ought to run and bind from the beginning at 90, to where the other boundary stood at 91; that from the grant itself it cannot be known, whether a

June 1821.

Hammond
v.
Ridgely

Where a tract of land, described as beginning at a tree standing by a river, and running and bounding on the said river N 4 degs. E 87 perches, then N &c sundry courses, then N 1 deg. W 48 perches to a bound oak by the river—It was held, that all the subsequent courses, after the first, were to be run according to course and distance, until the course N 1 deg, W 48 perches

location of the said tract, running and bounding from the beginning at 90 to the boundary at 91, according to the courses and distances expressed in the grant, will differ from a location binding on the said river from the one boundary to the other, but that this difference can only be discovered by extrinsic evidence. That the clause in the grant, describing how the land is to run from the beginning to that boundary, which is in the following words, to wit. "and running and bounding on said river N 4° E 87 perches, then N 62° E 50 perches, then N 21° E 107 perches, then N 8° E 62 perches, then N 20° W 45 perches, then N 37° E 40 perches, then N 26° W 32 perches, then N 1° W 48 perches to a bounded white oak by the river," may mean, and can be construed according to their true and grammatical construction, that these courses and distances should be run from one boundary to the other, but that the land should bind with the course of the river from the one to the other. That this clause is elliptical, and the expressions "running and binding with the river," may be understood and supplied before each of the courses there mentioned. That the expressions "binding with the river," though placed in the beginning of this clause before the first course, yet the clause may be construed in the same manner, and may have the same meaning, as if those words had been placed at the end of that clause after the last course, and that there is nothing on the face of the grant which proves that such was not the meaning of the parties.

Chase, Ch. J. The court, upon the prayers submitted to them, direct the jury, that although plots are necessary to show the position of the land, and the calls referred to in the grant, and evidence out of the grant is necessary to show their respective situations, yet not to aid in the construction of the grant, except in the case of a latent ambiguity. That the true construction of the grant of *Dorsey's Search*, according to the words and expressions therein, is to run the first course N 4° E 87 perches binding on the river, and all the subsequent courses according to the course and distance, until you come to the N 1° W 48 perches.

This construction is conformable to the plain meaning of the words, and gratifies every part of the grant, and is

JUNE 1821.

Hammond
vs
Ridgely

pursuant to the intention of the surveyor, to be collected from the words he has used. The construction contended for rejects all the courses subsequent to the first, and cannot be admitted, there being no call or binding expression in either of the courses.

The grant of *Robin Hood's Forest* differs from the grant of *Dorsey's Search;* the words, "then into the woods, N E and by N 220 perches to a bounded red oak," are omitted in *Dorsey's Search,* nor are words of similar import inserted. That expression, combined with the other circumstances mentioned, in the opinion of the court, in the case of *Charles Duvall* against *Nathan Jones,* indicated the intention of the surveyor to make the great branch of *Patuxent* river the boundary from the second boundary at the letter E to the beech, because an intention was manifested by all the expressions and circumstances before alluded to, and contained in the grant, not to depart from the river until the surveyor came to the beech, and so contended by the counsel. The court decided on the words of the grant, and did not resort to extraneous circumstances. Reject that expression, and the decision of the court would have been different.

It has been contended in the case of *Dorsey's Search,* that the words "running and bounding," ought to be supplied and made adjuncts or adherent to every distinct course, and that such is the grammatical construction. I admit it as to the word *running,* but not as to the word *bounding.* The word *running* is necessarily implied, because the surveyor could not locate the lines without running according to course and distance or calls, but *bounding* is not a necessary implication, nor is it the grammatical construction in this case to unite it to every subsequent course, because, as a figure of rhetoric, it ought not to make the surveyor certify what is not consistent with truth, and therefore it ought not to be supplied. The first course of *Dorsey's Search* is, "running and bounding on the said river," about which there is no dispute. The second course is N 62° E 50 perches, which is the course running almost directly from the river. If the surveyor does certify what is not true, by certifying course and distance and calls, and they do not agree, that is his own act; but he ought not to be made to certify what is not true by implication. It has been contended, that the word *then* is

a copulative, and makes every course bind on the river. It means "*afterwards,*" "*immediately afterwards*" or "*at that time,*" and such is its meaning in all surveys; that is, as soon as the surveyor came to the termination of one line he commenced running the next.

I have pronounced my opinion of that which I consider the true construction of *Dorsey's Search.* If I am mistaken, I derive great satisfaction from knowing my errors will be corrected by a superior tribunal. I can truly say I have taken pains to form a right judgment. The defendant excepted.

A grant of a tract of land, described as beginning at three bounded white oaks standing by the river P, and running & bounding on said river N 87 prs. then N, 50 prs. then, &c. sundry courses, then N. 48 prs. to a bound white oak by the river, then S 388 prs. to a bound white oak, then by a straight line to first bounded white oaks—must be run from the beginning to the nearest part of the river P, to be ascertained by the jury, and from thence N 87 prs. with the meanders of the river, expending the number of perches thereon, and from thence the subsequent courses, according to the course and distance, (the jury to allow for the variation of the compass,) until the course N 48 prs then, N 48 prs. to a bounded white oak by the river, then S 388 prs. to a bounded white oak, (the two last oaks being admitted) then by a straight line to the first bounded white oaks

3. The defendant then proved by the plots and explanations, and by the surveyor who made them out, that the line from the figures 90, the beginning of *Dorsey's Search,* (the original,) to the figures 57, marked on said plots by the river side, is S 65° 15' W 15½ perches in length, and that the figures 56 stand where 87 perches terminates, running the same from the figures 57, by and with the meanders of the river, and expending them on the meanders, instead of running a straight line of 87 perches in length from the figures 90. That the course and distance from the figures 90 to the red figure 1, by the side of the river, is N 35° W 25 perches, and that *Dorsey's Search* is located to red figure 2 by running 62 perches from the red figure 1, binding them on and with the meanders of the river and expending them on the meanders, and not by running a straight line of 87 perches, either from red figure 1 or from figures 90. And also that from figures 90 to the red figure 4 by the river side, the line is N 1° 15' W 136 perches. And further proved, that the plaintiff has located the fourth line of *Dryer's Inheritance* by running it from the post at figures 14 and 15, and running the 270 perches by and with the meanders of the said river, and expending them on said meanders, and thus terminating them at the figures 58 by the river side, instead of running a straight line of 270 perches in length to the river side. The de-

A grant of another tract of land, stated as beginning at a bounded red oak standing by a branch, and running N 86 prs. to a bound red oak in a branch, then N 362 prs. to a bound white oak. then N 120 prs. to a bound white oak standing by the river P, then bounding on the said river, and running S 270 prs. then by a straight line to the first bounded tree—Must be located to run from the beginning, N 86 prs. to a bounded red oak in a branch, then N 362 prs. to a bound white oak, then N 120 prs. to a bound white oak standing by the river P. then to the nearest part of the river, to be ascertained by the jury, then bounding on the river, and running with the meanders thereof, S 270 prs. then by a straight line to the first bounded tree, binding on the said straight line.

fendant then prayed the court to direct the jury, that he locations made by the plaintiff of *Dorsey's Search*, the original, as located on the plots, are not either of them warranted by, or agreeable to the true meaning of the grant of that tract. And also that the locations of *Dryer's Inheritance* made by the plaintiff on the plots, are not either of them warranted by, nor agreeable to the meaning of the grant of *Dryer's Inheritance*.

CHASE, Ch. J. The court are of opinion, that the true construction of the grant of *Dorsey's Search*, according to the words and expressions therein, is to run from the beginning to the nearest part of *Patuxent* river, to be ascertained by the jury according to the evidence, and from thence N 4° E 87 perches with the meanders of the river, expending the number of perches on the same, and from thence the subsequent courses according to the course and distance, (the jury making such allowance for the variation of the compass as may accord with the evidence,) until you come to the course N 1° W 48 perches, then N 1° W 48 perches to a bounded white oak by the river, then S 47° E 388 perches to a bounded white oak, (the two last oaks admitted by the parties,) then by a straight line to the first bounded white oaks.

And the court are also of opinion, that the true construction of the grant of *Dryer's Inheritance* is to run from the beginning, admitted by the parties, N 62° W 86 perches to a bounded red oak in a branch, then N 6° W 362 perches to a bound white oak, then N 66° E 120 perches to a bound white oak standing by the river, then to the nearest part of the river, to be ascertained by the jury according to evidence, then bounding on the river and running with the meanders thereof, S 5° E 270 perches, then by a straight line to the first bounded tree binding on said straight line. The defendant excepted.

4. The defendant then offered in evidence an agreement entered into in this cause, stating that when *Dorsey's Search*, the resurvey, was made, and for some time before, and thereafter until 1726, the river *Patuxent* was the boundary between *Baltimore* and *Anne-Arundel* counties; *Baltimore* county on the eastern side, and *Anne-Arundel* county on the western side of that river. And to prove the authority given to the deputy surveyors by their commissi-

f a certificate of survey, made by the surveyor of B county, includes land lying in A A county, a grant, on a caveat, would be refused for the land in A A county. But if a grant was obtained, and there was no flaud in its obtention, it will operate to pass the land

ons, and the authority given to *John Dorsey,* who was the deputy surveyor of *Baltimore* county when the resurvey on *Dorsey's Search* was made, and who made the said resurvey [for *John Dorsey,* jun.] the defendant offered in evidence the original record of the proceedings of the council, and of the commission granted to *Richard Beard,* [who made the survey of *Dorsey's Search,* the original,] on the 1st of December 1684, and of the commission to *George Noble* on the 8th of February 1733. The commission to *Beard* constituted and appointed him deputy surveyor of *Anne-Arundel* county, and that to *Noble* constituted and appointed him deputy surveyor of *Prince-George's* county, granting to them respectively, full power and authority to survey and resurvey lands within their respective counties; and in the commission to *Noble* he was restricted to surveys within the limits and bounds thereby assigned to him ,and to conform to orders and instructions, &c. The defendant also offered in evidence, that commissions also issued to *Thomas White,* of *Baltimore* county, dated the 4th of March 1733; *William Hanson,* of *Charles* county, dated the 7th of March 1733; *Robert Elliott,* of *Saint Mary's* county, dated the 7th March 1733, and *Henry Ridgely,* of *Anne-Arundel* county, dated the 15th March 1733; all which issued to them as deputy surveyors of the said respective counties, and are in the same form *mutatis mutandis* with the said commission granted to *George Noble.* The defendant also offered in evidence the instructions of the Lord Proprietor to regulate the conduct of his officers as to the manner of laying out and granting his lands. See them set forth in *Kilty's Land Holders Assistant,* 284, &c. The defendant also offered in evidence the warrant of resurvey to resurvey *Dorsey's Search,* granted to *John Dorsey,* junior, of *Baltimore* county, the 26th of January 1722, in which warrant that tract is stated by the petitioner for the warrant to lie in *Baltimore* county. The defendant also offered evidence that all warrants of resurvey to resurvey any tract or tracts of land were always directed to the deputy surveyors of the county or counties in which the tract or tracts to be resurveyed did lie. The defendant also offered in evidence, the commissions granted to *Vincent Lowe,* surveyor general of the former province of *Maryland* on the 12th of August 1685; and the commission granted to *Thomas Bordley,* surveyor

general for the *Western Shore* of the said province, on the 20th of May 1717. These commissions authorised respectively the appointment of deputies, &c. The defendant further offered evidence, that the proceedings of the council at the time when the said *John Dorsey* was appointed deputy surveyor of *Baltimore*, are lost or destroyed. The defendant then prayed the opinion of the court, and their direction to the jury, that the plaintiff could not be entitled by the certificate of *Dorsey's Search*, the resurvey, and the grant thereon, to claim any land which was situate on the west side of the river *Patuxent*, and in *Anne-Arundel* county.

CHASE, Ch. J. The court are of opinion, that the deputy surveyor had no authority to act beyond the limits of the county of which he was appointed surveyor, and on the return of the certificate it would have been cause, on a caveat in the land office, to refuse a grant for that part of the land which lay in *Anne-Arundel* county. But the grant having been obtained, and no fraud practised in the obtention of it, will operate to pass the land in *Anne-Arundel* county. The defendant excepted.

5. The plaintiff having given in evidence the title deduced by the defendant in *Dryer's Inheritance*, and *Hammond's Inheritance*, then gave in evidence, by the debt books of the late Lord Proprietor, that *John Dorsey*, the devisee of *John Dorsey*, the grantee of *Dorsey's Search*, (the original,) and those deriving title and claiming under him, always paid the quit rents upon the whole of *Dorsey's Search*, (the original,) and *Dorsey's Search*, (the resurvey,) from the year 1754 to 1774, that being the whole period embraced by said debt books, and that no quit rent was ever paid on any part of *Dorsey's Search*, (the original,) or *Dorsey's Search*, (the resurvey,) or either of them, by any other person or persons whatsoever, except *John Dorsey*, the devisee, *Ely Dorsey*, and the devisees of the last mentioned *John Dorsey*. And further gave in evidence the following entry on the rent rolls, viz. "479 acres 19 2 rent. *Dorsey's Search*, sur. 6th Decem. 1694, for *John Dorsey*, on *Elk Ridge*, beg. at 3 bound white oaks. Included in resurvey of *Dorsey's Search* in *Anne-Arundel* county." And further offered evidence, that *Elizabeth*

Where a tract of land was granted to A in 1694, & an adjoining tract was granted to B in 1695, and B entered upon a part of A's land, and it was possessed, used, and occupied by B, and those claiming under him, for upwards of 100 years, a conveyance will not be presumed from A to B for the land so possessed, nor that there had been an actual ouster of such part. But if B and those claiming under him, were in the adversary, uninterrupted, and exclusive possession, by enclosure, of the land in dispute, for 20 years, in such case A will be barred by the act of limitations. He who has title to a tract of land and is in possession of part, is in possession of the whole; and if two persons are in possession of the

same land, the one by title, and the other by wrong, it is his possession who has the right.

June 1821. *Dorsey,* the widow of *John Dorsey,* the grantee of *Dor-*
*sey's Search,* (the resurvey,) and mother of *Ely Dorsey,*
departed this life in the year 1777. The defendant then
prayed the court to direct the jury, that upon the whole
evidence so given to them as stated in the several bills of
exceptions, if they believe the same, they ought to find
that *John Dorsey,* the grantee of *Dorsey's Search,* the
original, did in his life-time convey to *Samuel Dryer* all
that part of *Dorsey's Search,* the original, on the west side
of *Patuxent* river, which is included within and bounded
by the said river, and the lines of *Dryer's Inheritance;* or
that the said *John Dorsey* was actually ousted of all that
part of *Dorsey's Search* by *Dryer;* and that upon the said
evidence the defendant is entitled to their verdict.

Hammond
vs
Ridgely

CHASE, Ch. J. The court have no doubt about the law as
to the right of the court to instruct the jury to presume
grants and deeds in cases where there is a proper and le-
gal foundation laid for the presumption of the jury, and
the courts have frequently so decided, but that law is not
applicable to this case.

This is a case of conflicting grants and interfering lo-
cations, and the question between the parties depends on
what is the true location of *Dorsey's Search,* and *Dryer's*
*Inheritance,* and the court have already decided that ques-
tion, and according to the opinion of the court the land in
controversy is included within the limits of *Dorsey's*
*Search.*

It is a principle of law, that he who has title to a tract
of land, and is in possession of part, is in possession of the
whole. A person holding land cannot occupy and use eve-
ry part of his land, nor can he have every part under
fence.

It is a principle of law, that if two persons are in pos-
session of the same land, the one by title, and the other by
wrong, it is his possession who has the right.

These principles are not only established by the decisi-
ons of the courts, and acquiesced in, but are founded in
justice and general convenience, favour right, and resist
wrong and oppression.

When *Dryer* entered on the land in dispute, and made
improvements, he entered on it as *Dryer's Inheritance,*
claiming it as such; there is no evidence that he claimed it

by deed from, or any contract with, *John Dorsey*, the grantee, nor is there any evidence that those claiming under *Dryer* claimed it otherwise than as part of *Dryer's Inheritance*, but that they possessed it as such, supported that possession *manu forte*, and resisted all attempts by those claiming under *Dorsey* to recover the possession. *Dorsey*, the grantee of *Dorsey's Search*, and those claiming under him, having the right to that tract, and being in possession of part, their possession pervaded the whole land, and was co-extensive with its limits.

The court are of opinion, that the evidence in this case will not warrant the court to direct the jury to presume a deed from *John Dorsey*, the grantee of *Dorsey's Search*, to *Samuel Dryer*, the grantee of *Dryer's Inheritance*, and refuse to give the direction prayed.

The court are also of opinion, that the entry and possession of *Samuel Dryer* on the part of *Dorsey's Search* in dispute, were tortious; and if the jury find from the evidence that he and those claiming under him were in the adversary, uninterrupted and exclusive possession, by enclosures, of the land in dispute, for twenty years, that in such case the plaintiff will be barred of his recovery by the act of limitations, and if not in possession of the whole land in dispute, to the extent of such possession. The defendant excepted.

6. The defendant then prayed the court to direct the jury, that by the will of *John Dorsey*, the eldest, if his *Patuxent* plantation was on the east side of the river, his grandson, *John Dorsey*, could not take any land on the west side of *Patuxent* river. Also, that if they believe that at the time of the deeds executed by *Deborah Dorsey* and by *Henry Woodward Dorsey* to *Richard Ridgely*, the grantors and the said grantee were out of possession of the land on the west side of the river, and that the same was at that time in the adverse possession of the defendant or those under whom she claims, nothing passed by those deeds, and that the legal title of the said land for which the ejectment is brought yet remains in *Daniel Dorsey*.

CHASE, Ch. J. The court are of opinion that the whole of the land called *Dorsey's Search*, passed by the will of *John Dorsey* to his grandson, *John Dorsey*, as well that

*June 1821.*

Hammond
vs
Ridgely

A devise of a tract of land by name, and described as lying in *B* county, passed the whole tract, altho'. part of it lay in *A. A* county.

If the grantor in a deed is in possession of part of the tract of land conveyed, that possession will extend to the whole tract, unless there had been an adversary, uninterrupted and exclusive possession by enclosures of a part of the land by some other person for 20 years prior to the execution of such deed.

June 1821. part lying on the west side of *Patuxent* river, as that lying on the east side of said river.

Hammond
vs
Ridgely

The court are also of opinion, that if the jury find that *Deborah Dorsey* and *Henry Woodward Dorsey*, the grant·ors in the deeds to *Richard Ridgely*, were in the possession of part of the land of *Dorsey's Search*, that possession will extend to the whole and every part of said land, and that the said deeds will operate to transfer the whole of said land to *Richard Ridgely*, unless the jury shall find an adversary, uninterrupted and exclusive possession, by enclosures, of part of said land by the defendant, and those under whom she claims, twenty years prior to the making and executing said deeds; and in case the jury shall find that the defendant, and those under whom she claims, had such adversary possession, in such case the said part will not pass by the said deeds to *Richard Ridgely.* The defendant ex-·cepted; and the verdict and judgment being for the plaintiff, she appealed to this court (a).

(a) The trial of this cause in the county court took up much time, and the several questions which arose were greatly contested by *Magruder* and *T B Dorsey* for the plaintiff, and by *Martin,* (Attorney-General,) and *Bowie* for the defendant. The counsel for the plaintiff, in their arguments on the points raised in the *first* bill of exceptions, cited *Norwood vs. Carroll, et al lessee, (Ante* 155.) *Ridgely, et ux. lessee, vs. Norwood,* 1 *Harr. & Johns.* 128. 1 *Phillips' Evid.* 410, 416 2 *Bac. Ab* 439, 649. 2 *Selw. N. P.* 780, 781 *Chew's lessee vs Weems,* 1 *Harr & M·Hen.* 463 And on the question raised in the *fifth* bill of exceptions, they cited *Davidson's lessee vs. Beatty,* 3 *Harr. & M·Hen.* 621, and *Cheney vs. Ringgold, et al. lessee,* 2 *Harr. & Johns.* 87.

The defendants counsel, in their arguments as to the questions in the *first* bill of exceptions, cited the act of 1790, *ch* 42. *Goodright vs. Welch,* 3 *Wils* 23 1 *Madd Chan Pref.* viii. *Dorsey's lessee vs. Hammond,* 1 *Harr. & Johns.* 190. *Calhoun & Roger, lessee vs. Hall,* 2 *Harr & M·Hen.* 416; *Mageehan vs. Adams,* 2 *Binny,* 109. *Thompson et al lessee vs. Brown,* 1 *Harr. & Johns.* 335 *Duvall vs. Jones, (Ante* 253 note *) Keech's lessee vs Dansey,* 1 *Harr & M·Hen.* 20 *Llewellin's lessee vs. Fendall & Simmes, Ibid* 242. *Hamilton's lessee vs. Cawood & Blacklock,* 3 *Harr & M·Hen* 437. *Snowden & Jennings vs Jones,* (in the land office.) *Martin's lessee vs Muse,* (E. S. general court) *Helms' lessee vs. Howard,* 2 *Harr & M·Hen.* 84. *Davis's lessee vs Balty,* 1 *Harr. & Johns.* 264. *Smith's lessee vs Volgamot & White,* 2 *Harr. & M·Hen* 155. *Beltzhoover vs. Rench,* (December 1814.) *Ashton vs Hammond, Land Hold Ass* 407. And on the question in the *fifth* bill of exceptions they cited *Bull. N. P* 103,· *Stra* 1142, *Cowp.* 214, 217, 102. *Ld· Raym.* 830. 12 *Mod.* 658, 659. *Ball. on Stat. ch* 2 12 *Ves.* 250, 2·5, *Phil. Evid.* 119, 120. 1 *T. R.* 431, 432, *(notes )* 1 *Bos & Pull.* 399, 400, 401. 3 *East,* 298. 3 *Saund.* 175, *(notes )* 3 *T R.* 151. 7 *T. R.* 492. 11 *East,* 488, 6 *East.* 212. 4 *Burr.* 1963. 1 *Pow· on Cont.* 309.

The cause was argued before BUCHANAN, EARLE, JUNE 1821.
MARTIN and DORSEY, J. (a), by

Pinkney and *Winder*, for the appellant, and by

Taney, Magruder and *T. B. Dorsey*, for the appellee.

Hammond
vs
Ridgely

The points raised by the counsel in their arguments, be-
ing fully stated by the judges in the opinions delivered by
them, it is deemed unnecessary to notice them here, or the
authorities to which they referred.

BUCHANAN, J. This suit was instituted in the county
court of *Anne-Arundel*, for two tracts of land, called
*Dorsey's Search*, one a resurvey on the other; and comes
before us on six separate bills of exceptions, the four last
of which, have been properly abandoned by the counsel
for the appellant, the opinion of the court below contained
in each of them, being clearly right.

A former ejectment had been brought in the late general
court, on the demise of *Daniel Dorsey*, for the same lands,
against *Rezin Hammond*, under whom the appellant
claims, which was marked on the docket to be for the use
of *R. chard Ridgely*, the lessor of the plaintiff below in
this case, and under whom *Daniel Dorsey* claimed as mort-
gagee. In that case, as in this, defence was taken for a
tract of land called *Dryer's Inheritance*, which being an
elder tract of land than *Dorsey's Search*, (the resurvey,)
it became important in the progress of the trial of the for-
mer suit, (as also of this,) to ascertain the true location of
the tracts of land called *Dryer's Inheritance* and *Dorsey's*
*Search*, (the original,) which depended on the construction
to be given to the respective patents. And the general
court adopting the principle, that it is the peculiar pro-
vince of courts to expound all grants, except in the case
only of a latent ambiguity, instructed the jury that the
fifth or last line of *Dryer's Inheritance* could only be cor-
rectly located, by running a straight course from the end
of the fourth line, to the beginning. And that according
to the true and proper construction of *Dorsey's Search*,
the first line should be run binding on the river *Patuxent*,

(a) CHASE, Ch. J. having decided the case in the county
court, and JOHNSON, J. having been concerned as counsel for the
defendant in the former action, did not sit.

and the eight following lines, according to the courses and distances expressed in the certificate and grant, and not to bind on the river *Patuxent;* and the jury gave a verdict for the plaintiff accordingly.

The case was taken to the former court of appeals on bills of exceptions, and that court assuming it as a princi- ple, that in all cases of ambiguity arising on the face of a certificate or grant, as to the location of a tract of land, the jury is the proper tribunal to decide the fact of loca- tion on evidence *de hors* the instrument, reversed the judgment of the general court, and sent the cause back by *procedendo,* and on a new trial the defendant got a verdict; which presents first, the question, whether that opinion of the court of appeals is binding and conclusive on this court?

It is readily admitted that no argument in support of the negative of the question can be drawn from the circum- stance, that that court is not now in existence; and that if it would have been binding on that court, in a subsequent suit brought for the same land, and depending on the same evidences of title, it is equally binding on this, and should be examined without reference to the abolition of that tri- bunal.

The original constitution of this state, in distributing the powers of the government, provides by the 56th article, "that there shall be a court of appeals, composed of per- sons of integrity and sound judgment in the law, whose judgment shall be final and conclusive in all cases of ap- peal from the general court, court of chancery, and court of admiralty," which words, "whose judgment shall be final and conclusive in all cases of appeal," &c. are supposed to be declaratory of the quality and legal effect of a decision of the court of appeals. And it has been urged with a commanding force, that in virtue of that provision of the constitution, a decision of that court is conclusive as to the subject matter of the decision, in any subsequent suit for the same thing.

It is conceded that the expressions taken literally, are broad and comprehensive, but it seems to me, that the terms used, must be construed with reference only, to the thing intended to be created—a constitutional court of appeals— and can alone be understood to mean, that the court of ap- peals so provided for, should be a tribunal of ultimate re-

sort, and that there should not be created any higher court
of appellate jurisdiction; intending only by the words, "fi-
nal and conclusive in all cases of appeal," that no suit tak-
en to the court of appeals, after being adjudicated there,
should be further prosecuted by appeal, to any other tribu-
nal, that each particular case of appeal, should terminate
and conclude with the judgment of that court; thus con-
stitutionally guarding against the establishment by the le-
gislature, of any other superior court of appellate jurisdic-
tion; and not that the decision should be conclusive, as
to the rights of the parties to the subject matter in contro-
versy, in any other suit.   And I believe the constitution
has never heretofore been otherwise understood.

To construe it differently, and according to the literal
import and signification of the terms used, would be to ex-
tend their binding quality, further than would perhaps be
seriously contended for, so far at least, as respects the ac-
tion of ejectment.   It would be to render a judgment of
the court of appeals binding and conclusive upon all, whe-
ther parties or strangers, for it would be difficult to prescribe
bounds to its operation, and to exempt strangers more than
parties, from the effect of its binding influence.   Unless
indeed, in favour of strangers, the constitution should be-
come the creature of arbitrary will, and be made to bend
to suit the particular case, seeing that a literal interpreta-
tion admits of no distinction between parties and strangers;
it is therefore binding upon all, if upon any, in any subse-
quent suit for the same land.   And yet it is a settled prin-
ciple, that the verdict and judgment in one action of eject-
ment, is no bar to a recovery in another, but that a party
interested, may sue for the same land as often as he thinks
proper; every new action of ejectment being supposed to
be between different parties,

The act of 1790, chapter 42, which was also pressed
into the argument, does not reach the question.   Until the
passage of that law, all causes that were carried to the
court of appeals, terminated there.   The judgment of that
court, was final in each particular case of appeal, accor-
ding to the literal provision of the constitution, and no
further proceedings were had.   And a plaintiff against
whom an erroneous judgment had been rendered, in the
inferior court, which was reversed in the court of appeals,
was under the necessity of commencing de novo.   And

Hammond
vs
Ridgely

even this he could not have done, if the judgment of the court of appeals had, according to the literal sense of the terms, been final and conclusive, for that would have arrested any further proceedings. But that was never supposed, and to remedy the inconvenience of being driven to bring a new suit, the act of 1790 was passed, which directs, that in all cases in which the judgment of the general court shall be reversed by the court of appeals, on writ of error or appeal by the plaintiff, (and also in certain specified cases, where the appeal is by the defendant,) the transcript of the record shall be returned to the clerk of the general court, with a writ of *procedendo* to the judges of that court, directing them to proceed to a new trial of the cause, and that the opinion of the court of appeals shall be conclusive in law, as to the question by them decided.

The expressions, "and that the opinion of the court of appeals shall be conclusive in law, as to the question by them decided," are relied upon as rendering the opinion of that court, conclusive as to the right of the parties, in any subsequent suit brought for the same thing. But however comprehensive they may be abstractedly considered, when construed as they must be, with reference to the subject matter to which they are applied—to the mandate of the *procedendo*, which they may be said to accompany, they can only be understood to mean, that the opinion of the court of appeals shall be conclusive upon the judges of the general court, on the new trial of the particular suit, so sent back to them, and can have no reference to any subsequent suit.

If any thing was wanting in support of this construction, that aid might be borrowed from the act itself, which has the very same provision, in relation to cases removed to the general court from the county courts; with this further provision, "that the party against whom judgment shall be rendered by the general court, may appeal, or prosecute a writ of error to the court of appeals." Now if the expressions used, that is, "that the opinion of the general court, shall be conclusive in law, as to the question by them decided," are to be understood according to their literal import, it would be useless to appeal from the judgment of the general court, and the provision giving to the party the right to appeal is grossly absurd, since the judgment of the general court would be conclusive upon the

court of appeals, and the appeal could afford no relief,
which it cannot be presumed was the intention of the le-
gislature.  Hence it would seem to follow, that the judg-
ment of the general court, was only intended by the legis-
lature, to be conclusive upon the judges of the county
courts, on the new trial of the particular suit sent back to
them by *procedendo*, and not to relate to any new or sub-
sequent suit.  And if so, as the same words, used in the
same law, and applied in the same manner, must be taken
to have the same meaning, the opinion of the court of ap-
peals can only be held to be conclusive upon the judges of
the general court, in the trial of the particular case sent
back by *procedendo*, and no further.

But though the act of 1790, *chapter* 42, will not bear
the construction attempted to be given to it, yet it serves
to shed a ray of light on the subject, by the aid of which
we are enabled to discern what was the legislative inter-
pretation at least, of the 56th article of the constitution
in the year 1790.  For. if under that article, a judgment
of the court of appeals was held to be final and conclu-
sive beyond the mere appeal adjudicated by them; if
it was deemed conclusive of the very right to the thing
in controversy, it would of course have been thought quite
sufficient, to make provision only for sending cases back to
the general court for new trial, without directing, "that
the opinion of the court of appeals, should be conclusive
in law, as to the question by them decided."  Since if con-
clusive as to the right of the parties in another action, it
would on the *procedendo* have been binding upon the judges
of the general court, under the constitution, and they
must have conformed to it, without that enactment.  Hence
it is clear, that neither the legislature, nor he who drew
the law, and who was obviously acquainted with the judi-
ciary system of the state, and the powers and practice of
the courts, understood the constitution to mean, that a
judgment of the court of appeals should be binding in any
subsequent action, or that it should be any further final
and conclusive, than as it put an end to the particular ap-
peal in which it was given, and to all further proceedings
in that suit by way of appeal.  And the whole subject
must have been before them, and under consideration, from
the very nature of the inconvenience intended to be reme-
died by the writ of *procedendo*.  What is said of the legis-

June 1821. lative interpretation of the constitution, applies as well to
the legal effect and operation of a judgment of the court
Hammond
vs
Ridgely
of appeals on general principles, as a court of last resort, for
if binding at all, whether by the constitution or on general
principles, the provision spoken of in the act of 1790,
was equally unnecessary. Nor is it believed, that there is
any reason in sound policy why it should be absolutely
binding. It ought indeed to be so far respected, as to se-
cure to it, all the beneficial results of a binding quality,
without its inconveniencies. It should always be approach-
ed with hesitation, and never should be lightly shaken.

Thus guarded, it stands as secure as sound policy
could wish. But even if it should be admitted, that under
the 56th article of the constitution, a decision of the court
of appeals on the legal merits of the case, is binding as to
the subject matter of that decision, in a subsequent action
between the same parties or those claiming under them,
for the same thing, or that independent of the constitution,
that would, on general principles be the legal effect and
operation of such a decision by a court of last resort; then
this question presents itself, Is the opinion of the court of
appeals, in the case of *Hammond* and *Dorsey* of that cha-
racter? And it appears to me that it is not. No decision
was made by that court upon the legal merits of the case;
the question there presented, arose on the construction of
two grants, as to the location proper to be made of the
lands, which necessarily involved the legal rights of the
respective parties, but on which, the court gave no
opinion. On the contrary they declared, that "in
their opinion, the expressions used in neither of the
grants, were so plain and explicit as to exclude all
doubt, and that they did not mean to say, in what
manner either of the tracts of land ought to be located,"
thus declining to give any construction to either of those
instruments. But assuming as a general principle, "that
in all cases of ambiguity arising on the face of a certificate
or grant, as to the location of a tract of land, the jury are
the proper tribunal to decide the fact of location on extrin-
sic evidence," they reversed the judgment of the general
court, without determining whether the construction given
to the grants by that tribunal, was right or wrong; leaving
the question of law, as to the true and proper construction
of the grants, entirely open and undecided, and referring

to a jury, (as it would seem,) not the construction of the grants, (for they have not said that that was a matter proper to be left to a jury,) but the fact of the original running or location, separate from, and independent of the grant. So, that in point of fact, no construction has ever been given to the language of those grants, either by the court of appeals, or by a jury. All that was in reality done by the court of appeals, was to refuse to decide the questions of law submitted to them, and to send the case back to be decided by a jury on a different question, a question of fact, out of the grants. And to give to the refusal of that court, to expound the grants in question, the effect to preclude all other courts from doing so, would be to make a verdict of a jury, on a fact of location, distinct from the expressions of the grants, binding and conclusive on the rights of the parties in any subsequent ejectment for the same land; a property not legitimately belonging to verdicts in actions of ejectment.

But if the opinion of the court of appeals can be understood, as casting the construction of the grants of *Dryer's Inheritance* and *Dorsey's Search* on the jury, it is merely an opinion on a question of jurisdiction; an opinion that it was a matter fit to be left to a jury, and not a decision on the legal effect and operation of the grants, not a judgment pronounced on the legal merits of the parties. And with all the deference due to the constitution of that tribunal, and to the character and standing of the individuals who compose it, I do not think it binding upon this court. Nor is it fit that it should be; the principle on which the opinion is expressly founded, is denied to be law, and has since been solemnly overruled in several cases; and if the opinion, the principle of which has been so ruled to be erroneous, stands at all, it must stand without legs; and they who claim under it, must hold contrary to the acknowledged law of the state, and the established rule for the exposition of all other grants. And thus there would be two received rules for the construction of grants, one governing *Dryer's Inheritance* and *Dorsey's Search*, and the other applicable to, and pervading all other grants; the two rules altogether inconsistent with, and repugnant to each other, and yet each of them equally available in the courts of law of this state.

<div style="text-align: right">June 1821.

Hammond
vs
Ridgely</div>

But I cannot perceive why, on any principle either of law or policy, an opinion of any court should be deemed of binding authority, when the foundation of that opinion is taken away. It is the principle that should govern, the substance and not the shadow. Sound policy does indeed require, that principles laid down, and acted upon by courts of last resort, should not be lightly shaken, as it is to established principles, and not to isolated opinions, that parties look in making their contracts. But when the assumed principle of an opinion in any case has been annulled, the opinion should fall with it, and the subject matter be made to rest upon the settled rule governing all other like cases.

It cannot be denied, that *Richard Ridgely*, the lessor of the plaintiff below, was substantially a party in the case of *Hammond* and *Dorsey*, but as neither the opinion of the court of appeals, nor the verdict and judgment in that case, can be relied upon by way of estoppel, (which certainly has nothing to do with the case as it is presented,) it is unnecessary to go into any examination of that doctrine. This case then, I think, stands altogether unaffected by that of *Hammond* and *Dorsey*; and as it has been ruled by this court, in several recent cases, and particularly in the case of *Pennington vs. Bordley's Lessee*, at June term 1819, that the construction of a grant, falls peculiarly within the province of the court, and is not a matter fit to be left to a jury, except only in a case of latent ambiguity, the construction proper to be given to the grants of *Dryer's Inheritance* and *Dorsey's Search*, remains only to be examined.

As to *Dryer's Inheritance* the only difficulty is, in determining how any doubt could ever have existed; for if one grant can be more clear and explicit, and more free from ambiguity than another, it is the grant for *Dryer's Inheritance*, in the description of the fifth or last line, which forms the subject of controversy. The expressions are, "then," (that is from the end of the fourth line,) "by a straight line to the first bounded tree," which must and can only be located, by running a straight course from the end of the fourth line, wherever that may be, to the beginning tree; and the meanders of the river *Patuxent*, as contended for, cannot be pursued without a direct violation of the grant. With respect to *Dorsey's Search*, if

there is any ambiguity, it is clearly patent, and falls with-
in the rule established in the case of *Pennington* and
*Bordley.* But if the grant alone is looked to, without re-
course to extrinsic matter, there will be found no difficulty
in expounding it, and it is only by resorting to matter *de
hors* the grant, to contradict, and not to explain it, that
any difficulty has been produced.

By inserting the word "running," immediately after the
word "then," at the beginning of each line, the sense is
made complete, and every word in the grant will be gra-
tified; and it is not proper that any thing more should be
understood, than that which is necessary to perfect the
sense. The words, "and bounding on the said river,"
cannot be introduced without evident risk to one half of
the description given in the grant; for if in point of fact,
the meanders of the river do not correspond with the
courses expressed in the grant, to adopt the words, "and
bounding on the said river," (as is insisted on,) would be
to reject the courses altogether, since under the authority
of a long course of decisions by the courts of this state,
the binding call on the river so adopted would be peremp-
tory; and thus by arbitrarily adopting what is not necessa-
ry to perfect the sense, that would be defeated which is
plainly expressed in the grant, the description. by courses
and distances. I agree therefore in opinion with the judge
before whom the cause was tried on each exception, and
think that the judgment ought to be affirmed.

EARLE, J. There are several exceptions in the record of
this case, brought up by the appellant, the defendant, in
the court below. The arguments of her counsel have a
bearing on the three first only, and the rest, it seems to be
admitted by them, are correct decisions, and ought to be
affirmed.

In the first exception the county court decided, that be-
tween the same parties, and those claiming under them,
the judgment of the court of appeals, on the same question
of law, is conclusive, but that *Richard Ridgely,* the lessor
of the plaintiff below, could not be concluded by the
question of law decided in the court of appeals in the
case of *Daniel Dorsey's Lessee,* use of *Richard Ridgely,*
against *Rezin Hammond,* because in a legal view he was
not a party to that suit, and claimed in this action by a

title paramount the title of *Daniel Dorsey;* and in the same exception the court further determined, that the construction of grants belonged exclusively to the courts of justice, except in the single instance of a latent ambiguity, where alone is devolved on the juries of the country, the right of exposition aided by evidence *de hors* the grant.

In the second exception, the parties were fairly before the court on the true meaning of the certificate and grant of *Dorsey's Search,* (the original,) and the court below decided, that after its first line, the tract was to be located to run with course and distance only, and was not to bind on the *Patuxent* river in any of its lines, except the first.

The third exception is a recapitulation of the first and second as to the court's opinion of the construction of the certificates and grants of *Dorsey's Search,* (the original,) and of *Dryer's Inheritance,* which last tract, in its last line, it was determined by the court, ought to be located with a straight line, and not circuitously with the windings of the river.

These exceptions, connected with the argument in the cause, have presented a question for the decision of this court, of high interest to the parties concerned, and of great moment to the public at large. It is a question which involves in its consideration, the legal effect an adjudication of this high court of judicature is to have on its own future operations, and being in every view momentous, it has engaged the best reflections, and the utmost attention of the judges.

There must reside in every court of supreme authority, and especially in this of appellate jurisdiction of last resort, a capacity of revising and correcting its own decisions. That such a power rests in this court, has been conceded in argument; and yet a construction of the 56th article of the constitution is insisted on, that seems to deny its existence. If, as it has been said, it is the literal meaning of this article of the constitution to make a judgment of the court of appeals final and conclusive in all future cases, in what case is it we are to exercise an authority to review and abrogate its decisions? This construction is so at variance with the very nature of courts of justice of supreme jurisdiction, it is fair to infer that such is not the intention of the constitution; and indeed, it appears to me, the expressions employed are inserted for a

quite different purpose—either to describe and characte-
rise the court established, or to restrain apprehended le-
gislative encroachments on the judicial functions of the
state.

The generality of the expressions of this article of the
constitution excludes the idea of an intention to make a judg-
ment of the court of appeals final and conclusive on the same
question of law between the same parties. Had this been the
object, more appropriate language would have been used to
express it; and that it was not the object is deducible from
the consideration that it was wholly unnecessary in every
other action, except the action of ejectment, in which the
propriety of it may be questionable. In all other actions,
but ejectment, former recovery may be pleaded in bar, and
this, by the rules of the common law, without the aid of
constitutional provisions. Moreover, if this had been un-
derstood to be the clear meaning of the 56th article of the
constitution, a part of the act of 1790, chapter 42, was
superfluous legislation. On the return of a record with a
procedendo, the opinion expressed in the case would have
been conclusive without enacting that it should be so.

Having expressed my opinion, that the article referred
to in the constitution does not render a judgment of the
court of appeals, on the same question of law, conclusive
between the same parties, I am equally decided, that the
act of 1790, ch. 42, does not make such judgment conclu-
sive, except on the subordinate tribunal to which the re-
cord is returned on a procedendo. It is to be remembered,
that this act of the legislature speaks of more appellate ju-
risdictions than one, of the appellate jurisdiction of the
general court, as well as of the court of appeals; and if
the opinion of the inferior appellate court is conclusive be-
cause it has been before expressed on the same subject mat-
ter between the same parties, it must have that effect in
the same case between the same parties when it appears in
the supreme appellate court; that is, the opinion of the in-
ferior must govern the opinion of the superior appellate ju-
risdiction. This cannot be the meaning of the act, and
thence it is to be inferred, that the opinion expressed in
the appellate court was intended to be conclusive only on
the court to which the record is returned on the proceden-
do. It is admitted in this last case, such opinion of the
superior court has a binding force on the inferior tribunals.

and if the injunctions of the law are obeyed by the county court, on a second exception the court of appeals will affirm, not because the opinion is approved, but because a court cannot err that obeys the positive injunctions of the law. This is the amount of the cited decisions between *Tenant* and *Hambleton*, and *Mundell's lessee* and *Clarklee*, and it was never intended that those decisions should be understood in any other way.

The solemn adjudication of an appellate court of last resort, I am free to admit, ought, on general principles of judicial propriety, to be approached with caution, and perhaps they should never be disturbed, except to settle some great rule of property the public interest requires to be reviewed. On a second trial in ejectment between the same parties, and those claiming under them, on the same subject matter, I should say they ought to be considered conclusive, unless, which is hardly a supposable case, glaring injustice has been done, or some egregious blunder has been committed. But to give the binding decision those conclusive qualities, it ought to be explicitly declared, and perfectly understood, and to become the law of the case it ought definitively to settle the rights of the litigant parties. If an exposition is given to a will or deed, fully defining the rights of the parties, or any other opinion is expressed settling the title to the thing in dispute between them, it should be deemed irrevocable, and never again touched, where the same persons, and those claiming under them, are concerned in the contestation. *Richard Ridgely*, the lessor of the plaintiff, was for every substantial purpose, a party to the ejectment formerly decided in the court of appeals between *Dariel Dorsey* and *Rezin Hammond*, and if that court have disposed definitively of the subject, and fully and explicitly determined the rights of the parties, this court ought to yield to the judgment, whatever our individual opinions may be of its correctness. This is not, however, in my apprehension, the character of that decision; so far from settling the meaning of the certificates and grants of *Dorsey's Search*, the original, and *Dryer's Inheritance*; so far from determining to whom the controverted land was originally granted, by a sound construction given to these documentary papers, the court of appeals have declared the courts of justice, and themselves inclusively, utterly incompetent, in point

of law, to give an exposition to them. That court has only adverted to those papers to say, that the office of locating those tracts, according to the meaning of these papers, to be come at through the medium of extrinsic testimony, belongs alone to another tribunal—to a jury of the country—and not to the court of justice. Agreeably to these ideas of the court of appeals, a jury has been allowed to act on the case, and the inconclusive nature of their verdict, being a verdict in ejectment, need not be dwelt upon. By thus acting, the court of appeals as effectually dismissed the case, in my idea, from their consideration; as if they had referred the decision of it to a distinct unconnected court or jurisdiction, whose adjudication certainly could not be said to express the opinion of the court of appeals. It is then my deliberate opinion, that the judgment of the court of appeals in the case of *Daniel Dorsey's Lessee* use of *Richard Ridgely*, against *Rezin Hammond*, ought not to have been considered conclusive by the court below, and by refusing so to consider it, that court has not erred.

It remains for me to say a few words on the construction of the certificates of *Dorsey's Search*, (the original,) and *Dryer's Inheritance*. And here I entirely coincide in the opinion pronounced by the learned judge in the court below. With him I think, that *Dorsey's Search*, (the original,) is to be located by course and distance in all its lines from the first to the second tree, except in its first line, which it is admitted on all hands is to bind on *Patuxent* River. Among the objections urged to this construction, the principal one appears to be, that the word "running" cannot be carried on from the first to the second and other courses, to render the sense perfect, without taking with it the words "binding on the river," and that there is a grammatical impropriety in disconnecting the one from the other. The solidity of this objection is not perceived by me, and a case may be readily stated, where the latter expressions, "binding on the river," might not only be dropped, but where to connect them with the word "running," in the subsequent courses, would be to oppose the acknowledged meaning of the sentence. Let us suppose that the expressions in the certificate had been thus; running and binding on the river *the two first* of the following courses, viz. N 4° E 87 perches,

Hammond
vs
Ridgely

then North 62° E 50 perches, then N 21° E 170 perches; and so on through all the courses of the certificate; to connect the latter words, "binding on the river," with the former word "running," and apply them to the third course, it would read "then running and binding on the river N 21° E 170 perches," in direct violation of the expressed meaning of the surveyor, who has declared that the two first only of the courses of the certificate should run and bind on the river. This point of construction is susceptible of much further elucidation, but I have only touched it to express my opinion on it, which I believe is supported by all the members of the court who have heard the argument. The question arising on the construction of the certificate of *Dryer's Inheritance* is too plain for discussion. It is most obvious, that the last, or home course, must be run with a straight line, and cannot be run with the meanders of the river, there not being a single expression any where to be found to sanction such a location.

I concur with the county court in their decisions on each of the exceptions, and in my opinion their judgment ought to be affirmed.

MARTIN, J.  I think the judgment of the court below, in the first bill of exceptions, is erroneous, and ought to be reversed; but I confess I feel great diffidence in my opinion, when in opposition to that of the learned gentlemen with whom I am associated.

In the trial of this cause several bills of exceptions were taken by the defendant to the opinions given by the court, but as the three last have been abandoned by the appellant, it is necessary for this court to consider the two first exceptions only.

It appears from the record in this case, that the tract of land called *Dorsey's Search*, was granted to *John Dorsey* in the year 1694, and was afterwards vested in *Richard Ridgely*, who conveyed it by a deed of mortgage to *Daniel Dorsey*. That an action of ejectment was brought in the name of *Daniel Dorsey*, the mortgagee, in the general court, to recover the possession of part of this tract from *Rezin Hammond*, the then proprietor of *Dryer's Inheritance*. That this action was instituted by *Richard Ridgely*, for his use and by his direction. That he alone conducted the suit, employed counsel to sustain it, paid all the expenses, and remained in possession of the land.

That a verdict was rendered against *Rezin Hammond*, who appealed to the court of appeals, where the judgment of the general court was reversed. That *Richard Ridgely*, having paid the money due on the mortgage, obtained a deed of release from *Daniel Dorsey*, and instituted this suit against the present defendant, who claims under *Rezin Hammond*, for the same land claimed in the first ejectment. I have given this short statement of the case to show the relative situation of the parties in both ejectments. That *Richard Ridgely* was the substantial plaintiff in both cases; that they were commenced by his direction, and prosecuted solely for his use and benefit; and therefore, for all the purposes of the question now before us, were the same parties, or those claiming under them.

Whether a judgment of the court of appeals is conclusive upon the question decided by them, between the same parties in interest, or those claiming under them, is presented to us in the first bill of exceptions; and in forming my opinion upon it, I have rested, in a great measure, upon the constitution of *Maryland*. Policy, public convenience, and the security of purchasers, are worthy the consideration of the court. They are powerful auxiliaries in this case, but I think the constitutional provision is peremptory, and conclusive upon it.

In the organization of the judicial system of this state, courts have been established with original jurisdiction, and in the course of judicial proceedings, either party may call in the aid of the court to decide upon questions of law. The judges thus called on are authorised to *expound* the law, but their decision is not conclusive upon it. It may be carried to a higher tribunal for adjudication. The court of appeals has jurisdiction of it, but when decided by that court, it is no longer subject to be revised. In the emphatic language of the constitution, it is final and conclusive; the question decided is put to rest; no court shall have a power to revise it; all courts shall be bound by it. The constitution declares, there shall be a court of appeals, whose judgment shall be final and conclusive in all cases of appeal from the general court, court of chancery, and court of admiralty. *It is declaratory of the power and effect of a judgment in the court of appeals:* And is not *conclusiveness* of decision consistent with the character and dignity of a tribunal of the last resort? The object to be attained

is certainly a point at which controversy shall cease; but this desideratum is defeated if it is still open to revision. It is a solecism of terms to say, a decision is final and conclusive, when it is subject to change and alteration.

It appears to me, no language can be more comprehensive than that of the constitution, and it must be conceded, no violence is done to it by my construction. No words of restriction; no words of limitation or explanation, are added to it; and I would ask, if the convention meant that the judgment of the court of appeals should *not* be subject to revision, what words would they have used more clearly to evidence that intention? Can human ingenuity suggest any terms by which it would be more fully expressed than that the judgment shall be final and conclusive? If it was intended merely to prevent the creation of other tribunals of justice, why was it not so expressly declared? Why use terms of universal import, if they were to be taken in a limited sense, unless indeed it was the object of its framers to give to that august instrument, all the uncertainty which, it seems from the argument, ought to belong to a decision of the highest tribunal in the state. Since then the language of the constitution is of general, and indeed *universal* import, I think we ought not to give it a limited construction, by which the law will be rendered fluctuating and uncertain, and a door will be opened to unceasing controversy.

This is my view of the constitution, and if it is not correct, what would be the consequence of it? If a judgment be reversed by the court of appeals, and a *procedendo* awarded, it is admitted, by the act of 1790, the decision would be conclusive, on the question decided, in a second trial, and the court would be bound to conform to it. Yet although they would be bound to conform to it in the second trial, if a new ejectment was instituted, and the *same* question was brought before the *same* court, between the *same* parties, at the next term, the decision would lose all its binding effects, and the court would be at liberty to set it at defiance. To day it would be binding and conclusive upon the inferior court; to-morrow it would cease to be law, and be disregarded by them. Litigation would be in a circle with no point of certainty on which it could rest.

It next becomes proper to inquire, what were the ques-
tions on which the general court and court of appeals dif-
fered, and whether those questions affected the merits of
the case depending?

It was determined in the general court, there was no
ambiguity or doubt in the grant of *Dryer's Inheritance;*
that the court, and not the jury, were to give the construc-
tion of it; that the grant was to be construed by itself,
and testimony extrinsic of the grant was not legal evidence
to aid in its construction; and upon the same principles,
the court, and not the jury, gave the construction to *Dor-
sey's Search.* The court of appeals negative and reverse all
those opinions of the general court.   They say, there is
doubt and uncertainty on the face of those grants; that the
court had no authority to construe them; that they ought to
have been submitted to the jury, who were the legitimate
tribunal, with the aid of extrinsic evidence, to give their
true construction; and for those errors they reverse the
judgment of the general court.   This is the construction I
give to the opinion delivered by the court of appeals.   It is
true, the language used by them is not very clear and ex-
plicit; but if they did not differ with the general court, and
differ in *essential points,* why did they reverse their judg-
ment?   And why did the decision of the court of appeals
govern the court below upon the *procedendo,* and produce
an effect in direct opposition to that of the opinion of the
general court in the first trial?   For we find in the first
trial, the court gave the construction to the grants, and the
verdict was for the plaintiff.   On the *procedendo* the con-
struction of the grants was submitted to the jury, and the
verdict was for the defendant.

It has been contended, that no construction has been
given by the court of appeals to those grants, and therefore
the decision has only established a general principle, and
not the law of the grants.   I admit the court of appeals
have not given a full construction to them; they have not
said whether their expressions were binding.   But can it be
a correct position, that because the court of appeals have
not decided *every* question that could arise in a cause, that
therefore its decision should not be conclusive upon those
hey did decide?

Altho' they have not given a full construction to those
grants, they have given a *character* to them, and they de-

JUNE 1820.

clared that the jury, and not the court, was the proper tribunal to constiue them.  The general court held the decision to be conclusive, and conformed to it.  In the trial of this ejectment, the same questions were presented to the county court, and in my opinion, the decision of the court of appeals was as conclusive upon them as upon the general court.

Upon the second bill of exceptions, I concur in the opinion expressed therein by the court below.  The binding expressions in *Dorsey's Search* ought to be confined to the first line, and cannot be extended further.

DORSEY, J. delivered his opinion, which we regret we have not been able to procure, in which he concurred with Judge *Martin.*

*Winder* suggested to the court, that as they were equally divided in opinion, no judgment could be rendered; but

THE COURT directed the judgment to be entered *affirmed.* See *Dighton vs Grenville, Cole's cases. in Parl.* 66, where the judgment was affirmed, there being three judges for reversing, and three for affirming, so that a majority being required to reverse the judgment, it was of course to stand.

JUDGMENT AFFIRMED.